ALDEN B. ATKINS, PLAINTIFF IN ERROR, V. HELEN C. GLADWISH, DEFENDANT IN ERROR.

1. **Assault:** CIVIL ACTION : EVIDENCE.   In a civil action for damages by a female plaintiff, for an assault upon her with intent to have carnal intercourse with her, *Held*, That statements made by the defendant of and concerning the plaintiff, derogatory to her character, before and after the alleged assault, and too remote therefrom to be deemed a part of the *res gestæ*, were inadmissible in evidence.

2. ———— : DAMAGES.   An instruction to the jury, in the action above specified, that in case they should find for the plaintiff they might include in their assessment of damages compensation for "loss of good name, honor, and reputation," *Held*, Error.

3. ——: ——. An instruction in such case, "that in enter-
ing the amount of plaintiff's damages, should they find in her
favor, you may take into account the fact that she has been
compelled to employ counsel and spend time and money to
vindicate her rights," *Held,* Error.

ERROR to the district court for Johnson county. Tried
below before BROADY, J.

*Marquett, Deweese & Hall,* for plaintiff in error, cited:
*Boyer v. Barr,* 8 Neb., 68. 2 Sutherland on Damages,
291 to 394, 302 to 306. *St. Peter's Church v. Beach,* 26
Conn., 355. *Titus v. Corkins,* 21 Kas., 722. *Howell v.
Scoggins,* 48 Cal., 356. *Falk v. Waterman,* 49 Cal., 224.
*Fairbanks v. Witter,* 18 Wis., 287. *Kelley v. Rogers,* 21
Minn., 147. *Day v. Woodworth,* 13 Howard, U. S., 363.

*A. E. Howard* and *Lamb, Ricketts & Wilson,* for de-
fendant in error, cited: *Craker v. Chicago & Northwestern
R. R. Co.* 36 Wis., 679. *Hewlett v. Cruchley,* 5 Taunt.,
277. *Pierce v. Oard,* 23 Neb., 828.

COBB, J.

The plaintiff sued the defendant in the district court of
Johnson county. As the petition is short, and its consid-
eration important to a proper decision of the case, I here
copy its substantial parts at length:

"For that, on or about the 9th day of November, 1886,
and while the plaintiff was alone in her school-room where
she was teaching, at or near the village of Smartville, in
the county of Johnson, school-room was situated so remote
from any house or dwelling that alarm could not be given,
and while so pursuing her duties, the said defendant,
without the knowledge of the plaintiff, came to the school-
room of said plaintiff, and did then and there assault the
said plaintiff, with foul and indecent purpose to do vio-
lence to her person, and by force and intimidation to

criminally know her, the said plaintiff; that the plaintiff was greatly alarmed, and by reason thereof the plaintiff suffered and still suffers great mental anguish, humiliation, and bodily pain, to the plaintiff's damage in the sum of ten thousand dollars," with prayer for judgment.

The answer of the defendant consists of a general denial.

There was a trial to a jury, with verdict for the plaintiff, and a finding of damages in the sum of five hundred dollars.

Defendant's motion for a new trial being overruled, he brings the cause to this court on error, and assigns the following errors:

"1. The court erred in overruling the defendant's objection to the introduction of any evidence, for the reason that under the issues made the plaintiff was not entitled to recover, there being no cause of action stated in plaintiff's petition.

"2. The court erred in overruling the defendant's motion for a nonsuit, as made at the conclusion of the testimony for the plaintiff, the evidence not being sufficient to sustain a verdict in favor of the plaintiff.

"3. The court erred in giving to the jury paragraph one of the instructions requested by the defendant herein.

"4. The court erred in giving paragraph number two, as requested by the defendant herein.

"5. The court erred in giving to the jury paragraph number three of the instructions requested by the defendant herein.

"6. The court erred in giving the 4th paragraph of the instructions requested by the defendant herein.

"7. The court erred in giving the 5th paragraph of the instructions requested by the defendant herein.

"8. The court erred in giving the 6th paragraph of the instructions as requested by the defendant herein.

"9. The court erred in giving the 7th paragraph of instructions as requested by the defendant herein.

"10. The court erred in giving the 8th paragraph of instructions requested by the defendant herein.

"11. The court erred in refusing to give to the jury the 1st paragraph of the instructions requested by the plaintiff herein.

"12. The court erred in refusing to give to the jury the 2d paragraph of the instructions requested by the plaintiff herein.

"13. The court erred in refusing to give the 4th paragraph of the instructions requested by the plaintiff herein, as requested, and by changing the same and giving the same as changed by the court.

"14. For error of law occurring at the trial, and excepted to by the plaintiff herein.

"15. The verdict is not sustained by sufficient evidence."

Passing the first and second assignments, we will examine the others together.

The plaintiff took the stand as a witness in her own behalf, and testified that she was 24 years old, her business teaching school; had been teaching seven years in Johnson and Gage counties; first met the defendant at his own house some eight years ago; next saw him when she went to apply for the school in his district, a year ago last April; he was school director; she hired to teach the school, commenced the first Monday in September; defendant's house was about one-quarter of a mile from the school-house; plaintiff boarded at Mr. Murphy's, whose house was about half way between the school-house and the house of the defendant, along the same road; the front of the school-house faced the east; the front door was near the north corner of the east end, about eighteen inches from the corner; the teacher's desk was in the east end of the school-house on the south side; the school-house across the east end was about eighteen feet wide; there are cross-roads where the school-house is; the roads run on the east and north sides of the school-house.

Plaintiff had been teaching there about two months before the evening of the event of which her complaint is made. During that time she had not seen the defendant very often; had gone to his house several times on business; once to get a dictionary, once to get a copy of the school laws, and once to get his children to come to Tecumseh during the fair. Had not seen him for about two weeks before the 9th day of November. His children said he was away on business. When she first saw him that evening, she testified, " I heard his buggy, and glanced up and saw him driving over the hill on the north side of the school-house, along the road running east and west, coming along the side of the school-house."

Q. Where were you at that time?

A. Sitting at my desk, writing.

Q. When did you next see him?

A. When he opened the door.

Q. Did he knock or give any warning before he opened the door?

A. No, sir, he did not.

Q. State how he opened the door, and how he stood?

A. He just opened the door and put one foot on the threshold, and put both hands upon the sides of the door frame.

Q. What did he say?

A. He said, " Are you here?"

Q. What did you answer?

A. I said, " I am."

*       *       *       *       *       *

Q. What further did he say, after he said " Are you here?"

A. He said he had stopped to see when I would be ready, or whether I was ready to join the association.

Q. What association did he have reference to?

A. The detective association.

Q. What did you say?

A. I said that I had told him several times that I would not join the association.

Q. He had spoken about it before, had he?

A. Yes. He asked me sometime before to take a case, up north, and offered me $5 a day and expenses, if I would take the case.

Q. Did he tell you where the case was that he wanted you to take?

A. No, he only said it was in the northern part of Nebraska.

Q. What did you say?

A. I told him I would not.

Q. After you had told him that you had told him before that you would not join the association, what further did he say or do?

A. He said, " You are going back on them in that way, are you ?" And I said that I never promised that I would join it.

Q. What did he do after that?

A. Then he snatched my pencil from my hand.

Q. Then what?

A. I asked him to return it, and he did so.

Q. Then what did he do?

A. He tipped me under the chin and tried to put his arm around me?

Q. With which hand did he tip you under the chin?

A. He still had his right hand on the door frame, and he did that with his left hand, then he lowered his right hand and tried to put it around me, and I stepped back.

Q. Did he say anything?

A. No, sir, and I told him to let me alone.

Q. Then what did he do?

A. He drew a revolver.

Q. State how he did that—state just what was said and done, about him drawing a revolver?

A. He had on his overcoat and put his hand inside of

it and drew out a revolver and held it up this way.    (Indicating.)

Q.    At this time, when drawing the revolver, or had the revolver drawn, did he say anything?

A.    He said I was afraid of him.    I told him to put his revolver away or I would have him arrested for carrying concealed weapons.

Q.    Did he have to stoop down in any way to get the revolver?

A.    No, he did not.

Q.    What did he say after that?

A.    He looked at me a few moments and then asked me to shoot it at a mark.

Q.    Did you ever use fire-arms in any way yourself?

A.    No, I never did.

Q.    Did you ever talk with him before, touching the matter of shooting at a mark?

A.    No, the time I called at his house to get the school laws, his little boy took a revolver off the clock shelf, and I asked him to put it away, as I was afraid of it.

Q.    Was that in the presence of Mr. Atkins?

A.    Yes, sir.

Q.    What did he do next?

A.    When he asked me to shoot at a mark his team ran from the front of the door.

Q.    What did he do when the team started?

A.    He turned round and ran after them, caught them, and came back to the school-house, fastened the lines to the buggy frame, and when he started into the school-house they ran again.

Q.    What did he do then, run and catch them?

A.    Yes, sir.

Q.    Did he come back to the school-house the third time?

A.    No, sir.

Q.    What did you do while he was getting his team?

A.   I stood outside the building—I stayed outside the door only about a minute.

Q.   Where did he stand?

A.   By the buggy, and held the lines.

Q.   Is there any other door from that school-house by which you could get out?

A.   No, sir.

Q.   Was he at any time farther away from the door than you, so as to permit you to get out?

A.   No, sir.

Q.   How far into the house did he go at any one time?

A.   He was standing on the threshold; he did not come into the house at all.

Q.   How long afterwards was it that you saw him to speak to him?

A.   It was between three and four weeks afterwards.

A further examination of the plaintiff, to a considerable extent, here followed, as to a visit to the school-house by defendant three or four weeks afterwards, in company with J. Dillon, moderator of the school district, and of conversations there between plaintiff and defendant, and others, the greater part of which consisted of questions by the plaintiff as to defendant's reason for coming to the school-house on the evening of November 9th, and his behavior there, and of his replies to such questions. No part of the examination appears to have been objected to by defendant.

The plaintiff's examination was continued as follows:

Q.   What other reason did he give for going there?

A.   I believe the next one was that he saw I was trying to shun him, and he was anxious to know why. The other reason he gave after; he spoke about my reputation not being good. He said he had heard rumors about me, and he stopped to find out whether or not it was true.

Q.   Did he, on the evening of November 9th, ask anything about the truth of these stories?

A.   No, sir, he did not.

Q.   Who did he claim, in this last conversation, that he learned anything derogatory to your character from?

Objected to, objection overruled, defendant excepts.

A.   When I told him if there were any stories about me it was untrue, and I wanted to know what the stories were, and who told him, he said one of the parties lived in Adams and one in Sterling. Said I, "Very well, the time may come when you may want to prove this." He said, "There is no use of making a fuss about it; one of the men, the one that lives in Adams, was drunk, and the other one said it was only a rumor."

Q.   Did he say what those stories were?

A.   No, he did not.

Q.   One of the reasons he gave was to see if these stories were true?

A.   Yes, sir.

Defendant objects, and moves to strike out all the evidence as to rumors and stories, as incompetent under the issues in the case. Motion overruled and exceptions noted.

        *        *        *        *        *        *

Q.   State how you were affected by this demonstration on his part. What effect did it have on you physically?

Objection overruled, and exceptions noted by defendant.

A.   It was a great shock to my nervous system.

Q.   State after that time how it affected your system, your general spirits, and your general health?

Objection overruled, and exception noted by defendant.

A.   It has almost unfitted me for work; for I hardly think of anything else since it happened.

Q.   State if it has affected your rest of nights?

Objection overruled, and exception noted by defendant.

A.   It has. I do not sleep soundly for thinking of it. My rest is broken, and for a long time it seemed as if a heavy dark object like a cloud hung over me.

Lawrence Murphy, a witness for the plaintiff, testified in reply to

Q. Did you ever have any conversation with the defendant before going to the school-house, and before the 9th of November, touching the character of the plaintiff, or certain rumors he claimed to have heard?

A. Yes, sir.

Q. State what that conversation was?

Objection overruled, and defendant excepts.

A. He said there were certain rumors about her, and he wanted me to watch, and if there was anything wrong to tell him, and he would tell me something else.

Q. Did he say what these rumors were?

A. No, not in particular.

Q. Did he afterwards tell you what these rumors were?

A. Yes, sir, he said he heard certain rumors up on Hickory creek, about what some fellows said about her when she was up there teaching school.

Mrs. Mary Murphy, a witness for the plaintiff, on cross-examination testified in reply to

Q. Did you ever have any conversation with defendant in which he said anything touching the character of this plaintiff?

A. I do not remember of his saying anything particular about her character.

S. P. Peterson, a witness for the plaintiff, testifies in reply to

Q. Did you ever have a conversation with defendant in regard to the plaintiff's character for virtue?

A. Yes, sir.

Q. What did he say about it?

Objection overruled.

A. It was on the 24th of December, at Sterling, he said he knew something about the plaintiff that was too awful to tell, and he could prove it by two men at Beatrice.

Although there are several assignments of error based upon the erroneous giving and refusing instructions to the

jury, but four of them will be set forth in this opinion, being Nos. 3, 5, 6, and 7.

"III.    In determining whether or not the defendant, committed the acts complained of, you should take into consideration the conduct of the defendant, both before and after they are said to have occurred, and also his statements made afterward concerning the matter, and if from all the evidence in the case you find that the defendant did commit the assault complained of, either with or without the intent to ravish and carnally know the plaintiff, then you are instructed to find for the plaintiff.

V.    While the jury are not authorized by law to give exemplary or punitive damages in this case in event a verdict is found for the plaintiff, yet, if the jury find for the plaintiff, full compensatory damages should be awarded, and in arriving at compensatory damages the jury are not restricted to mere pecuniary loss; for besides damages for pecuniary loss or injury, the jury may allow such other damages as are the direct consequence of the acts complained of, including damages from injury to plaintiff's health, for physical pain and suffering, anguish and distress of mind, loss of spirits, sense of shame and humiliation, and loss of good name, honor, and reputation to such extent as the evidence may show the same, if any.

"VI.    In entering the amount of plaintiff's damages, should you find in her favor, you may take into account the fact that she has been compelled to employ counsel and spent time and money to vindicate her rights.

"VII.    You are instructed that any rumors that defendant may have heard concerning plaintiff's character, whether true or false, would not justify the defendant in assaulting her, or attempting to put her in fear of bodily harm by a show or demonstration of force."

By the petition in this case it will be seen that this is an action for damages on account of an indecent assault. The issue presented to the jury was that of the truth or falsity

of the charge against the defendant, and by him denied. Had there been evidence that, at the time of committing the acts by the defendant which are relied upon to prove an assault, he spoke words derogatory of the character of the plaintiff, such words would doubtless be admissible in evidence against him, as a part of the *res gestæ;* but I cannot conceive upon what grounds, either of reason or authority, it can be claimed that words spoken by the defendant in derogation of the good name of the plaintiff, either before or after the time of the alleged assault, and entirely disconnected with that transaction, are admissible in evidence against him.

That the admission of such evidence on the trial was prejudicial to the defendant is obvious. It would seem that the court and counsel well-nigh lost sight of the fact that the action before them was for criminal assault, and not for defamation of character. Hence, nearly at the close of the fifth instruction at the plaintiff's request, the court charged the jury that in this action they may compensate the plaintiff for the loss of good name, honor, and reputation, and that, too, after having charged in the third instruction that they might find for the plaintiff, in case they found that the defendant committed the assault complained of, with or without the intent to ravish and carnally know her.

As bearing upon the claim of the plaintiff in error of excessive damages found against him, the sixth instruction to the jury is objectionable. The court there charged them "to take into account the fact that the plaintiff had been compelled to employ counsel and to spend time and money to vindicate her rights," which is deemed to be an erroneous charge in this action. In the case of *Boyer v. Barr*, 8 Neb., 68, the rule was laid down that, "in a civil action in the nature of *trespass vi et armis* for assault and battery, the plaintiff's right of recovery was limited to an amount of damages equal to the full compensation for the

26

injury sustained, and that such amount could not be increased by the addition of punitive or exemplary damages." This rule was adhered to in the case of *Roose v. Perkins*, 9 Id., 304, and followed in *Riewe v. McCormick*, 11 Id., 261, and maintained in *Boldt v. Budwig*, 19 Id., 739; and I think it may be said to be a general, if not an universal, rule, that the expenses supposed to be incurred by a plaintiff in prosecuting a suit for tort will only be considered where punitive or exemplary damages are recoverable. The cases cited by counsel for the plaintiff in error, *St. Peter's Church v. Beach*, 26 Conn., 355, *Titus v. Corkins*, 21 Kansas, 722, *Howell v. Scoggins*, 48 Cal., 356, *Falk v. Waterman*, 49 Cal., 224, *Fairbanks v. Witter*, 18 Wis., 287, and *Kelley v. Rogers*, 21 Minn., 147, are authorities to this point.

At the conclusion of the argument, on the trial, the court below gave the additional charge that, "it is well to remind the jury that this is neither an action of slander nor libel, but an action for damages for an alleged assault. If you fail to find the assault alleged, you will find for the defendant; if you find the assault alleged, you will find for the plaintiff. If for the plaintiff, you can only find damages resulting from the assault. The damages must be actual compensation for the injuries sustained by reason of the assault. All your findings must be from the evidence admitted during the trial;" which charge, if taken alone, without inconsistent enlargements or limitations, comprehends the law, as I understand it, correctly; but I conceive it to be irreconcilable with the fifth instruction before given. These two charges being given, the jury may not have distinguished properly between them, and were liable to be misled as to the grounds of their verdict and the measure of damages.

As there must be a new trial of the issue, we express no opinion as to the first, second, and fifteenth assignments of error.

The judgment of the district court is reversed, and the cause remanded for further proceedings in accordance with law.

REVERSED AND REMANDED.

THE other judges concur.